In the Matter of Proving the Last Will and Testament of ANNA KING. Late of the Town of Fulton, Deceased.

· Surrogate's Court, Schoharie County, December 19, 1927.

**Wills — probate — instrument purporting to be will of decedent cannot be probated in face of proof that provisions of Decedent Estate Law, § 21, were not followed as to execution of will — no presumption of due execution from attestation clause.**

An instrument bearing a date in the body thereof and indorsed " will of   *   *   * " with an attestation clause and a paper entitled " codicle," containing four lines without any date or attestation clause, cannot be admitted to probate in the

face of the testimony of two persons, purporting to be witnesses, that the testatrix neither signed the instrument in their presence nor acknowledged her signature to them after signing, and that at the time they affixed their signatures to the documents she did not declare it to be her last will and testament as required by section 21 of the Decedent Estate Law.

The presence of an attestation clause does not carry any presumption that the will was executed according to the statute, where the subscribing witnesses did not pay any attention to the language of said clause.

PROCEEDING for probate of will.

*F. Walter Bliss,* for the executor, petitioner.

*W. H. Sidney,* special guardian for William Rockstroh.

BEEKMAN, S.  An instrument bearing date July 27, 1922, in the body thereof and indorsed "Will of Anna King dated July 25, 1922," with an attestation clause and a paper entitled " codicle " containing four lines without any date or attestation clause are propounded for probate herein.  Both papers bear the signatures of the testatrix and the same two persons purporting to be witnesses.  The first paper above referred to, which we will call the " will," is on the usual printed form.

The will bequeaths her property to William Rockstroh, who had been a member of her family for several years, but who is not an heir at law or next of kin.

Section 21 of the Decedent Estate Law provides as follows:

" § 21.  Manner of execution of will.— Every last will and testament of real or personal property, or both, shall be executed and attested in the following manner:

" 1.  It shall be subscribed by the testator at the end of the will.

" 2.  Such subscription shall be made by the testator in the presence of each of the attesting witnesses, or shall be acknowledged by him, to have been so made, to each of the attesting witnesses.

" 3.  The testator, at the time of making such subscription, or at the time of acknowledging the same, shall declare the instrument so subscribed, to be his last will and testament.

" 4.  There shall be at least two attesting witnesses, each of whom shall sign his name as a witness, at the end of the will, at the request of the testator."

This case is a repetition of those numerous cases where persons resort to some trusted friend without any knowledge of the law of wills, to prepare what is probably the most important instrument that they may have had any occasion to execute.  In this case the draftsman, who is a layman, did not even sign the instruments as a witness.

No objections to probate have been filed.

Section 144 of the Surrogate's Court Act provides: " Before

admitting a will to probate, the surrogate must inquire particularly into all the facts and circumstances, and must be satisfied with the *genuineness of the will, and the validity of its execution.*"

In obedience to the above provision the surrogate must particularly consider the validity of the execution of the testamentary papers. This duty the surrogate cannot disregard, even where, as in *Matter of Shaper* (86 Misc. 577), no objections to probate are filed.

In this case neither subscribing witness has ever signed as such on any other will at any previous time, although one of the witnesses had executed his own will under the supervision of an attorney. The witness Barber states that he and the testatrix had a conversation at the door of her dwelling. He said Mrs. Anna King told him she was going to make a will and asked: " If I thought Fred Zeh would be her witness to the will, and I told her I thought he would. She said she would get word to Fred Zeh by William Rockstroh and that we need not take the time to come there that busy season, but that we could sign them in the evening, and she would send the will over with William Rockstroh." Barber testifies that she referred to some of the provisions which the will would contain. This was the only conversation he had with the testatrix before the alleged signing of the will. At the time of that conversation Barber did not see either the alleged will or codicil. He says that he first saw the papers in the evening. In the testimony there is considerable uncertainty as to whether the subscribing witness subscribed the two papers the evening on which Barber had his conversation with the testatrix at her doorway or on the evening of the next day, and Barber testifies that the first time he saw these papers was in the evening. At one time he says that William Rockstroh brought the papers over in the evening and at another time the witness stated that he did not see William bring them over, but the papers were there at his house, meaning the will and the codicil.

The other witness, Zeh, lived a short distance from Barber. The testatrix had no conversation whatever with Zeh about the will, but Zeh testifies that William Rockstroh at one time " a little while before the signing said to me that Mrs. King had a paper she wanted me to sign." When the paper purporting to be the will was signed by the witnesses at the house of Mr. Barber, the testatrix was not present. Both witnesses positively swore that the testatrix was not present when they signed either the will or the codicil. During the day the will was signed, Zeh says that Barber, standing on his premises, had called to Zeh, whose premises were some little distance away, telling him he had a paper for

him to sign, and Barber wanted Zeh to come over and sign it. Zeh says: " I won't say he said it was Anna King's will or not." When Zeh went to Barber's house, Barber states that he, Barber, read the will aloud. There is considerable testimony as to the circumstances surrounding the signing of the will and codicil by the witnesses, but it is clear that the witness Zeh had no conversation relative to the will or codicil with the testatrix, while Barber had a conversation with the testatrix as to the will before the witnesses signed, as above stated. Neither subscribing witness saw the testatrix sign the will or codicil and the testatrix at no time acknowledged or stated in any manner that the paper purporting to be a will was her last will and testament or that the paper purporting to be a codicil was a codicil to her last will and testament. She at no time pointed to her signature on the will or codicil and stated or acknowledged that it was her signature. Neither witness saw the papers in the presence of the testatrix. The draftsman of the will testifies that he saw her write her signature on the will, and he saw her sign her name to the paper purporting to be a codicil. The draftsman is somewhat uncertain as to just when the codicil was written. He says the codicil is in his handwriting.

" Q. When was that written out? A. That — I couldn't say just when. Q. Was it at the same time you wrote the rest of the will? A. I don't think it was."

The testatrix gave the two papers to the draftsman of the will and he kept them in his possession until he delivered them to the attorney for the executor after the death of the testatrix. The draftsman was not present when the witnesses signed the papers aforesaid.

As to the attestation clause, the witness Barber was asked: " Q. Now, at the time you and Mr. Zeh signed the will, did you read over the last paragraph beginning with ' the above instrument ' and ending with ' at the end of the will? ' A. I think so. I couldn't swear as to where I left off. I read it to Fred Zeh myself and I think I read it all. I couldn't swear as to the fact where I left off. The Court: Will you swear that you read the printed part beginning with the words ' The above instrument ' and ending with ' at the end of the will.' A. No, sir. I would not want to swear to it. I think I read it, but I don't want to swear to anything that is written, and I wouldn't swear that I read that. Q. Now that states as follows: ' The above instrument, consisting of one sheet was, at the date thereof, subscribed by Anna King the testator named in the foregoing will in the presence of us and each of us.' Now, as a matter of fact, according to your testimony, it was not

subscribed by her in the presence of you or Mr. Zeh or either one of you, was it? A. No. If I had read it carefully I might have noted what it said, because I could have understood that part, if I read it carefully."

Taking all the evidence together I conclude that the subscribing witnesses did not pay any attention to the language of the attestation clause on the will. Not ever having been called upon to act as witnesses, and not having been informed as to how a will should be executed, they evidently paid no attention to the language of the attestation clause, and took for granted all that was necessary for them to do as witnesses was to sign their names and addresses on the two dotted lines immediately above the printed words " two witnesses required."

No doubt Mr. Barber, who was superintending the execution of the will, was correct when he said: " If I had read it carefully (that is, the attestation clause), I might have noted what it said, because I could have understood that part of it if I read it carefully." Under such circumstances, the fact of there being an attestation clause cannot carry any presumption that the will was executed according to the statute. Both witnesses gave every evidence of being candid, honest and intelligent men. Mr. Barber is a school teacher. There is no evidence of any fraud in this case.

The court must be guided by the statute, the object of which is to lay down the course of procedure which will prevent designing persons from fraudulently preparing testamentary papers. If the statute is observed, there can be no question as to the identity of the particular testamentary paper or the identity of the person who purports to be the testator or as to the identity of the testamentary subscription. Furthermore, the object of the statute is to prevent the substitution of one paper for another. Where there is no proof of fraud or lack of testamentary capacity, a surrogate may be inclined to regret refusing probate. However, the feeling of regret must give way to the duty of the court to comply with the statute, which has pointed out the formalities which must be observed before a will can be admitted to probate. A dangerous precedent should not be established. In this connection, where the statute may work hardship, and there is a temptation from the purely human and sympathetic standpoint to override the statute in the special case and circumstances, we are reminded of the old cautionary maxim that " Hard cases make bad law." (1 Wait's Pr. 13.)

" If the error cannot be corrected in a legal manner, it must go without redress. Courts of justice should take care that they are not misled by the hardship of a particular case * * * to make

a precedent which would run counter to well-established principles." (*Supervisors of Onondaga* v. *Briggs*, 2 Den. 26, 32.)

The Court of Appeals in *Matter of Andrews* (162 N. Y. 1) said, after quoting the statute in relation to the manner of the execution of a will: " These are the only restrictions imposed upon a testator when executing his will and they appear to be wise, reasonable and easily understood. It has been repeatedly laid down as the rule in this State   *   *   *   that the intention of the testator is not to be considered when construing this statute, but that of the Legislature. The question is not what did the testator intend to do, but what has he done in the light of the statute. It is undoubtedly true that from time to time an honest attempt to execute a last will and testament is defeated by failure to observe some one or more of the statutory requirements. It is better this should happen under a proper construction of the statute than that the individual case should be permitted to weaken those provisions calculated to protect testators generally from fraudulent alterations of their wills.   *   *   *   The defeat of testamentary intention in a few cases is not due to the statute, or the construction of it by the courts, but to the fact that scriveners and other laymen, ignorant of the simple and clear provisions of the statute, are permitted to draw wills."

In *Matter of Keeffe* (155 App. Div. 575; affd., 209 N. Y. 535) the court says: " To be validly executed, therefore, the subscription, not the will, must have been acknowledged to each of the witnesses. An acknowledgment to one will not do."

In *Lewis* v. *Lewis* (11 N. Y. 220) the court says: " It [form of execution of a will] cannot   *   *   *   be presumed in opposition to positive testimony, merely upon the ground that the attestation clause is in due form and states that all things were done which are required to be done to make the instrument valid as a will."

In the case at bar both witnesses agree upon the facts, which show that there is an absence of compliance with the statute. Zeh evidently paid no attention to the language of the attestation clause on the will, and a portion of the evidence of Barber, the other witness, as to whether he paid any attention to the attestation clause, is discussed above.

In *Woolley* v. *Woolley* (95 N. Y. 231), where there was an attestation clause, the court denied probate on the ground that the testatrix did not sign in the presence of the witnesses; that there was no proof that the testatrix acknowledged the signature to the witnesses, and that the testatrix did not declare the paper to be a codicil to her will. The court, after reviewing the evidence, says: " If it should finally be held that a will could be admitted to

probate upon such evidence, the statute prescribing the formalities with which wills should be executed, would be substantially nullified and its wise purpose defeated. All that would then be needed would be a formal attestation clause, and then the will could be admitted to probate without any further evidence from the witnesses as to the requisite formalities, and even, as in this case, against their evidence. It is not denied that a will may be proved, even against the evidence of the subscribing witnesses, by other sufficient evidence, and that the due execution of the will may be inferred from a regular attestation clause, and all the surrounding circumstances tending to show due execution. But here there is nothing from which the inference of due execution can be legitimately drawn."

In *Mitchell* v. *Mitchell* (16 Hun, 97; affd., 77 N. Y. 596), where there was also an attestation clause and where the testator declared the instrument to be his will to both of the witnesses, the court denied probate on the ground there was no acknowledgment by the testator of his signature, to the witnesses, where the signature of the testator was not written in the presence of the witnesses, and where it did not affirmatively appear that one of the witnesses saw the testator's signature.

This case is not one of the class where witnesses have forgotten the circumstances surrounding the execution of the will, or do not distinctly remember that all the necessary legal formalities were complied with. They are positive in their testimony that the testatrix did not sign the will in their presence, that she did not acknowledge her signature to them after the signing thereof, and that at the time they affixed their signatures to the two documents she did not declare it to be her last will and testament, and Zeh is positive that the testatrix did not have any conversation with him in which she asked him to become a witness to either will or codicil. That is to say, there is positive testimony that the legal formalities were not complied with. (See *Matter of DeWitt*, 198 N. Y. Supp. 92.)

Neither the instrument propounded as a will nor the instrument propounded as a codicil thereto was validly executed as the statute requires and probate must be denied, and decree will be entered refusing and denying probate of both instruments offered for probate.